v. Commissioner of Internal Revenue Service. And first we have Ms. Klein. Good morning, and may it please the Court. Congress could have chosen to limit the reach of Section 581 to a federally registered bank. It did not. It did that elsewhere in the Code, but not in this provision. For this specific tax purpose, Congress defined a bank more broadly, and based primarily on function, not form. A bank accepts deposits and makes loans. And that's in keeping with the history and purpose of this provision, the protection of depositors. Now, MoneyGram is not a federally registered bank. But the same is true of every institution in all the leading cases where the courts have applied this statutory language. For example, in the Staunton case, the corporation at issue was not chartered as a bank, was regulated separately and differently from banks, and was even prohibited by law from calling itself a bank. But none of that disqualified it from being a bank for this tax purpose because the evidence showed that its customers made deposits and obtained loans. In every case addressing this statutory language, the appellate courts have looked to function, considered from the perspective of the institution's customers, and disregarded form. In this case, it's uncontroverted that millions of individuals, hundreds of financial institutions, thousands of small businesses, used MoneyGram as their bank. They deposited billions of dollars with MoneyGram. They obtained billions of dollars in working capital loans. And MoneyGram provided these traditional functions in a form that fit its customers' needs. It's also uncontroverted that MoneyGram suffered the kind of losses that Section 582 covers and is subject to the same kinds of limitations on its ability to buy and sell securities that underlies Section 582. Now, what changed that made MoneyGram consider itself a bank? Originally, it did not claim to be a bank, and then it changed. Well, nothing changed, but this provision of the tax code became applicable when MoneyGram suffered the very kind of losses that the provision was intended to cover in the wake of the financial crisis in 2007 and 2008. So at that time, its status as a bank for the first time became relevant for tax purposes. This provision has very rarely been necessary, thank God for us, because it really only comes into play when you have a catastrophic market event. And that was exactly what Congress was trying to protect depositors against, because MoneyGram is subject to these same kinds of limitations. It has to maintain what are reserves in the amount equal to its payment obligations, its deposits. It has to maintain those reserves in the form of permissible investments, which are highly rated securities. If those investments fall in terms of their value, as happened dramatically in 2007 and 2008, MoneyGram can't hold those because it will no longer be in compliance with the regulations. So all of these same kinds of justifications. But the provision already has been in place for some time. It's not a new provision that was taken advantage of. It had been there for some time? The provision had been there for some time, but the necessity to use it had not come into play before, so there was no reason to address this issue before that time. Under what supervision was MoneyGram? MoneyGram is regulated, is highly regulated, by a number of different regulators. It's regulated by a number of different regulators in all 50 states. And we have attached, yes, just like the corporations in Staunton and the Morris Plan cases. Congress clearly did not limit this to federal banks. That's clear from the case law. So the tax court's summary conclusion that MoneyGram is not a bank, to get to that conclusion, the tax court had to read into the statute restrictions that are not found in its plain language. It had to exalt form over substance in a way that's contrary to precedent and statutory purpose. It had to disregard uncontroverted evidence about the nature of these loans. And it had to make numerous fact findings that are not supported by the summary judgment record and in many ways are contradicted by that record. What I'd like to focus on today is the loan requirement and the deposit requirement and highlight the law and the record evidence demonstrating that those requirements are met in this case. With respect to the loan requirement, there's an established test to determine whether or not a transaction is a loan. It's described on page 49 and 50 of our opening brief, but it comes down to the question, was there an agreement whereby MoneyGram advanced money to another party and the other party agreed to repay it on agreed terms? That's the established test for a loan. The tax court inexplicably disregarded that. They could pay it off in installments? Yes. The way these loans worked was that MoneyGram's agents could retain the funds collected from money orders for a set period of time that was set forward in the agreement. There was a regular... What was the period of time? Would that depend on the particular situation, six months, a year, two years? It depended first on a credit analysis that MoneyGram undertook on each of its agents, and so the remittance period varied from agent to agent. Remember, these agents typically are small businesses, and they are using these funds as working capital in their operations. What's the length of the loans? The way the loans worked is that it was like a series of recurring loans. So instead of remitting the money immediately, they would hold it for a period of days. They would remit then, and then a new loan would start, and they would hold that money for a period of days. So it's sort of like a line of credit where they could use these funds in their day-to-day operations. The terms of the agreement were established following a credit analysis. Is there a difference between a delayed remittance agreement and a loan? Not for this purpose. Again, when you're looking at whether or not there's a loan for this purpose, you look from the customer's perspective, and I think what's important to remember here is, number one, both the IRS and MoneyGram treated these delayed remittances as loans. MoneyGram disclosed the credit risk from these loans in its public filings, recorded them as debts in its accounting records and tax returns. The IRS, it's uncontroverted, allowed bad debt deductions when these loans became uncollectible. Back to my question, how long were the loans? They were recurring loans that happened every week. So there would be, instead of remitting the funds immediately, the loan would allow the agents to hold those funds for a period of days, remit, and then start a new loan. How long were the loans for? It was a recurring series of loans. Each loan was for a period of days. A period of days? Yes. So you couldn't loan money for six months or a year, pay it back in installments like a traditional loan? Theoretically, the remittance agreements could have been that long if the credit analysis supported that. The examples that we have in the record were not that way because that wasn't the kind of loan that MoneyGram's customers needed. So there are different types of loans, and this loan is different from the traditional loans that banks give? I don't think that the statute talks in terms of a traditional loan that banks give. The statute talks in terms of loans. Do banks give these types of loans for two days? I don't. Well, they have lines of credit where you draw down a line of credit for a short period of time and then pay it back, but the line of credit is available to you on a recurring basis. Is that a loan? Yes, it is, especially when you look at the case law, which says that, for example, the Calcasieu case says that form is not dispositive of whether or not there's a loan. There's a multi-factor test here, and if you look, these loans were documented and collateralized. There was a reasonable prospect of repayment based on the credit analysis. The agents had a fixed repayment schedule. Repayments were made in most cases, and the parties conducted themselves in accordance with a loan, and that's the multi-factor test that this court has always used to determine. What was a master trust agreement? Is that a different type of thing? I have different phrases here, and it was called different things, and they were calling it a loan, but it's been called other things under the contract. There are two different agreements that come into play, and in this case the commissioner has not defended the tax court's justification for why there wasn't a loan, what had to do with interest. The commissioner has not defended that position, understandably, because the case law is clear that you don't have to have interest to have a loan, and in this case the interest was delayed. But the case law overwhelmingly rejects the commissioner's primary argument, which is that trust language in the agreement between MoneyGram and its agents somehow negates this uncontroverted evidence of the nature of the transaction. And if you look at that case law, first of all, the Woods case and the Washington case, which are cited in our brief, looked at the exact same trust language and said it was ineffective to create a trust. Neither the tax court nor the commissioner even acknowledges those cases. Second, there's a substantial body of cases, including Judge Wiener's opinion in the Tran case, which cites Judge Posner's opinion in the Marciano case, which looked at statutes that purported to impose trust on agents who collected lottery ticket proceeds. And the court in both of those cases said that even though the statute purported to impose a trust, it was not effective to impose a trust based on the circumstances of that case, which are remarkably similar to the circumstances here. Here it is uncontroverted that both MoneyGram and the agents understood that these funds that were loaned would be commingled with other funds that the agent used in its business, that commingling, in fact, did occur. And if you think about it, there would be no reason to have these loans unless the agent was going to use these monies for their business operations. That's all discussed in the Osher affidavit, which is at tab 8 of the record excerpts. The evidence was also uncontroverted that it was impossible to segregate these funds because these agents are cash businesses. They don't have separate cash registers for money order funds, for check cashing funds, for other funds. So the evidence is uncontroverted that the funds were commingled. The Woods and Washington case also showed that commingling was common. So it's clear from the record here that the essential purpose of these agreements was a loan, and there's no way to get to the tax court summary judgment without disregarding that evidence or making fact findings that are improper in the summary judgment context. I see my time is running low. I want to talk about the deposit requirement. Again, if you look at the cases, the courts really focus on the customer's perspective. The Valley Morris plan case out of the Ninth Circuit is a good example. They look to whether the customer is an investor who's knowingly assuming market risk for a promised reward or is depositing money upon the assurance that it will be available for use on demand. Clearly, the customers here of MoneyGram are the latter, and the funds that they entrust to MoneyGram are deposits for the purposes of Section 581. Again, the evidence is uncontroverted. The official check accounts were deposits. The money order deposits were deposits. Those are addressed in the Osher affidavit, the Crumple affidavit, and the Waltz affidavit. That's tabs 6, 8, and 9. Finally, I want to talk a little bit about the practical effect of this case. The practical effect is to deprive the tax court's decision is to deprive MoneyGram's customers of the protection that Congress intended for all depositors. The reality is that for many of MoneyGram's customers, they didn't have access to a traditional bank. MoneyGram was the bank that was convenient, affordable, and comfortable for them. The barriers to access to other banks included geography, language, culture, hours of operation, and there's nothing in the statutory language, the purpose, the history, the precedent that would justify disadvantaging those customers, those depositors, as against depositors who got the same service at the fancy bank across town. My time is up. Mr. Hutter? Thank you, Your Honor. May it please the Court, Randall Hutter for the commission. I want to make three points, if I can get to them all. Number one is that all of the language in this statute, Section 581, makes it clear that Congress intended for this provision to apply to banks and not just to any kind of business corporation that provides financial services. The statute expressly says that it applies to banks or trust companies, not financial services in general. The statute requires an entity receive deposits, not just payments, and to make loans and discounts. These are typical words used in banking. These are typical banking transactions. One of the phrases in the statute that informs the meaning of the entire statute is the one that says that if an entity exercised fiduciary powers, they must be of the type of powers exercised by national banks under the authority of the comptroller of the currency. That language in the statute indicates that that's what the statute is talking about, entities that have the character and the type of transactions of national banks. Deposits is a term of art in this statute. Loan is a term of art. They're banking terms, and they should be limited. They might not fit the traditional thought that we all think of banks, but technically they're arguing that they do have money that's deposited and held for somebody for a few days and given back and such, that sort of they do have deposits and they do have loans. They might not fit the traditional banking things that we think of, but it fits the definition of the statute. How do you respond to that? Number one, I want to emphasize that deposits and loans in this context must be seen in the banking context, and MoneyGram sells financial products and financial services. They don't take in deposits. They don't create a customer account. They take the money and they give a product or a service in return. It's like buying a gift card at a retailer. You give the retailer some money, you've got a gift card. The retailer doesn't then owe you anything. You might be able to get a refund, but you've paid a fee, you're not going to get that fee back, and plus if you've gotten a gift card for $40, you can't go back and say, I want 20 of it back. No, there's going to be a whole different transaction. They're going to cancel that one and give you a $20 gift card, and you'll get your $20 back. You haven't got money in there, in MoneyGram, that they are safekeeping for you, and safekeeping is a hallmark in the case law of what defines a deposit. This is a financial transaction that occurs very quickly, and once the money comes into MoneyGram, it's MoneyGram's money. It's not holding it for the customer. The trust agreement shows that. The trust agreement says these are our funds, agent. You may hold them. You must segregate them. You must pay them to us in three or four days if they have that lengthy, longer agreement under which they can pay. Where do we look for the definition of deposits and loans, those terms? Are they case law? Are they statutory definition somewhere? They are case law. We've cited cases in our brief that say that, typically, a deposit in the banking sense is money that is put in for safekeeping. The Staunton case and others that come after that say that, and there's a Supreme Court case we cite in our brief, I think it's called Smith, that says that a bank is a moneyed institution to facilitate the borrowing, lending, and caring for money. MoneyGram doesn't care for another person's money. It cares for its own money. It provides a service, but it doesn't take deposits in the way that this statute means. This statute had to be amended in 1951 to add the language to apply to building and loan associations. You would certainly think that a building and loan association might have an easy argument, oh, we've fallen into this definition, but no. The statute had to be amended to that. It's never been amended to include a transmitter like MoneyGram, and MoneyGram has been in business as long as the statute has been enacted. Would you touch on the question of regulation, which government entities, the Federal Reserve Board, the Comptroller, the FDIC, or the Department of Treasury? Right, those entities, the FDIC certainly has nothing to do with MoneyGram, and MoneyGram does not pay depositor insurance. This is not regulated at the federal level as a bank is and by the banking agencies. It's regulated on many state levels by the same agencies that regulate banks. Is the money services business a term of art in the regulation, the Department of Treasury? Yes, and the regulations, I believe it is, specifically say that a money services business cannot include a bank. So they are mutually exclusive under the federal law, and that's for good reason because a money transmitter such as MoneyGram doesn't pay FDIC insurance, and they don't want to pay FDIC insurance. It's very interesting that for every other purpose, MoneyGram does not want to be a bank and has never wanted to be a bank. They don't want that federal regulation and that cost. And it's just in 2007 when they experienced a lot of losses that they decided to take a gamble and that they might try to come within 581. Section 581 is not a section that you can opt in and opt out of on a yearly basis based on your investments. You shouldn't be able to come in one year and say, oh, we lost $20 million, we're a bank, 581 applies, we can write those off. Whereas it doesn't apply in any other year. That doesn't make any sense. The statute, if it were interpreted broadly too, might apply to building and loan associations, insurance companies, because they take in money, they give loans. It doesn't apply to insurance companies. It applies to banks. MoneyGram is not a bank. And the Staunton case shows that, and the Magruder case, decided by the same court after Staunton, shows that because the Magruder case dealt with something that was definitely a trust company, took money in, but the bank decided that, no, I'm sorry, you don't qualify under this statute because you don't take deposits from the general public and you're not conforming with the terms of this statute. It interpreted the statute narrowly. And that's the way the statute must be interpreted. There are cases that MoneyGram cites that say that, for instance, money orders are just like checks. Well, those cases, if you look at them, focus on the instrument itself. They're not looking at the funds behind those. They don't analyze the term deposit. They don't analyze the funds behind them. Yes, money orders work similar to checks. You can pay somebody with them, but you've bought something. You've bought the money order. You haven't deposited the money into an account for safekeeping to use at your own discretion. You've bought it in a particular amount, $40, $100, $150, and that's the way you're going to use it. It's a product that you then pass on. With regard to the loans, unlike a bank, MoneyGram does not lend any money to any of its customers at any time. MoneyGram's argument that it makes loans to its agents is contrary to the evidence in the record. The record shows that the agents hold proceeds payable to MoneyGram in trust and that the trust funds may not be commingled. I'm not allowed to testify and give evidence in this case, but I know that a retailer can have a separate cash register for MoneyGram proceeds and transactions. That's not such a hard thing to do. In the agents' hands, the funds are not loans. They are proceeds from customers due to be paid over to MoneyGram. The funds can't be used by the agents as working capital. They're only in their hands for two or three days. They have to be immediate. You can't go and buy and commit that fund to inventory if you've got to pay it out to MoneyGram in two or three days. They're not really funds that can be used by the agent. MoneyGram cites cases such as Woods. What is the evidence on that point? Well, the evidence is that under the agreements, the agents have to turn that money over in three to four days. There's a declaration by a MoneyGram officer who says that they have to turn that money over twice a week as opposed to immediately. And from there on, there's no evidence, but I'm saying how do you use money for three or four days? Is there any evidence that customers or people did? I'm just asking what the evidence is. The customers who buy money orders and things aren't getting loaned. It's the agents. The retailers, right, right. No, there's no evidence one way or the other. The agents did not testify that they used it as working capital. There is a declaration by a MoneyGram officer, which is hearsay as far as the agents are concerned, saying that the agents use it that way, but that's not firsthand evidence. That's secondhand evidence. There's no testimony or evidence by the agents themselves that, hey, we can use this as working capital. This is loans to us. It's very important to our business. There's no evidence of that whatsoever. MoneyGram cites cases such as Woods in Washington to support their argument that the funds are not really held in trust because MoneyGram did not enforce the trust agreement. There is no case that supports the idea that a third party, such as the IRS, may not rely on a trust agreement simply because the parties to the agreement previously agreed between themselves to ignore it. The cases that MoneyGram cites are cases between the two parties, such as MoneyGram and the agents, saying those are in trust for me. No, they're not in trust for me. You let me use them as I wanted to, so they're not in trust for you. But they are in trust for you. You signed this agreement. We're a third party coming in and saying, are you telling me we can't rely on this trust agreement because you guys didn't honor it? There's no trust. There's no case at all out there saying that we are, therefore, prohibited from relying on the trust agreement because they decided to treat it a different way. Did the tax court apply the correct definition of loan in this case? I think there was something where it said it included interest and generally had a fixed repayment period. Does a loan require interest? I'm not going to say that that's an absolutely essential ingredient. It's a common ingredient. I don't know how anybody would go to a bank and get a loan without interest, but family members can conduct interest-free loans, create a document that has a loan interest-free, and there are often court cases saying, well, that was a gift. No, it was a loan. So if you don't charge interest, it's a factor that the government can hold up in court and say, that's evidence that it wasn't a loan. So, yes, it's a very important part and it's a very common part, but we weren't willing to take the step further that says that without the interest it's absolutely not a loan. But in the common parlance of a banking transaction, a loan is going to be charging interest and the bank is going to be receiving interest. In this case... Is that a factor that the tax court took into account, that in this particular situation there was no interest? I mean, was that... It did. It did. And I can't fault the tax court for doing that because the tax court was looking at typical banking transactions. We simply, in addition to that, want to emphasize that the funds were held by the agents under a trust agreement and that they had to be repaid every three or four days and the agents never requested a loan, never was any money advanced from MoneyGram to the agents. These are proceeds that the agents took in from customers buying money orders. The funds weren't advanced from MoneyGram in any way and they had to be repaid in three or four days. The agents were just seeking something that was more convenient than turning the money over every single day. They weren't seeking... There's no evidence from them saying that they were seeking money to use in their business and they needed these loans. Three or four days of a loan doesn't do a whole lot of good. A six-month or one-year loan, these are not... That's not what these are. Despite the fact that they may recur from week to week, these agents have to constantly keep returning this money to MoneyGram and it's MoneyGram's funds the whole time. Those sum up my primary points. In closing, I'd just like to say that Section 581 has been in existence for decades, but MoneyGram never considered itself a bank for any purpose prior to 2007. In fact, it continues, even in those years, to use the code on its tax return for a non-depository institution. It does not choose to say it's a depository institution when the document requires a signature under penalty of perjury. It's properly characterizing its business on those forms. It doesn't take deposits. But all of a sudden, in 2007, it suffered large investment losses and decided it was worth a gamble to see if it could qualify as a bank under Section 581 and avoid taxes. Where was the downside in just taking that risk? But it's a logical stretch. Its position is illogical, and the tax court's decision that it is not a bank should be affirmed. Does the court have any further questions? Thank you very much. Can I have my budget for time? Yeah, we've got nine. We'll lend it to you. I don't know if you think it's a loan, but you'll have to pay it back to us next time you appear before the court. Fair enough. What's the evidence about working capital? Yes. Tab 8 of the record excerpts, Mr. Osher's affidavit, it describes the credit analysis that money goes through before it sets the terms of these agreements, and then it says, paragraph 31, once the credit limit is set, it is understood that the agent will use MoneyGram's funds in his business. It is also understood that the agent will not segregate the funds, Indeed, because money orders are entirely a cash-based business, it is practically impossible to do so. The vast majority of agents do not have separate cash registers for the sale of money orders. When a customer hands the agent cash to buy a money order, the cash goes into the store's or bank's cash register. The agent may then use that same cash to complete the other transactions. So that is uncontroverted evidence of the commingling and the use of the funds in the agent's business. It's also described, this practice is described in both the Washington and the Woods case. It is common. I wanted to get back to Judge Weiner's question about regulation. That's described in the Johnson affidavit, which is record excerpt tab 7, and it's also detailed in the brief. And the state regulations mirror, in many respects, the federal regulations that you were referencing. For example, MoneyGram is subject to supervision, examination, reporting requirements that have as their end the protection of depositors, required to maintain permissible investments in the amount of 100% of its deposit obligations. Required by? By the state law. By the state law in every state. And, of course, because it operates nationally, it has to comply with the most conservative nationwide. And, Judge Prado, to get to your point, I think when someone comes in with cash that they've earned in their job and they buy a money order so that they can pay rent later in the month, they certainly expect that those funds will be held in safekeeping, and it is MoneyGram's obligation to hold those funds and to pay those funds on demand at the direction of the customer, just like when I deposit money in my checking account and then I write a check to pay my rent check. And the fact that these funds don't stay on deposit for years and years and years reflects the socioeconomic status of the depositor, but it is not relevant for the statutory purpose. What is the effect? You mentioned all the state regs. Yes. That your client is registered with the Treasury as a money services business. Yes. And I wanted to get to that point because it is just simply not true that those things are mutually exclusive. There is no regulation, and this is addressed specifically in our brief. They pulled an excerpt from some crime. It's the Money Fraud Act. There's a provision that they excerpted totally out of context, but nothing says that you cannot be a bank for purposes of Section 581 if you're a money transmitter. There is simply no federal regulation that says that. Well, is this bank, if you're a bank, are you exempt from the normal bank requirements of being regulated by the Federal Reserve Board or the comptroller or the FDIC? Well, some of the same laws that apply to federal banks also apply to money transmitters. So, for example, privacy laws and consumer protection laws and financial crime laws, the Bank Secrecy Act, MoneyGram is subject to. But the regulations that restrict the reserves and the limitations on buying and selling securities, those emanate from state law, but they mirror in substance the federal restrictions. Does that answer your question? I guess so. Ask me again if I didn't get there, because I want to be clear. I mean, it's the same thing in these Morris Plan cases. For example, in those cases, those institutions were subject to state law, not federal law. And, in fact, under state law, they were prohibited from accepting deposits. The state law said you're not a depository institution. But for purposes of this tax provision... Well, the state-chartered banks are still under FDIC. But, like, Staunton was not a state-chartered bank. It was an industrial loan corporation that had totally separate and different regulations than a state-chartered bank. So it is a very... It is a very different consideration than the kinds of things that you're... I think have in mind. And it is a broad definition, and it really focuses on the substance of the functions that the institution performs. Just quickly... That's not quickly. I'm sorry. I was trying to organize my thoughts so I could be quickly. I did want to get back to your question, Judge Prado. There is an active market, my colleague Mr. Hussaini, confirmed by even traditional banks that offer loans that are only a day or two in length. These are unquestionably loans for tax purposes. Also, the reference to the amendment to the statutory provision referencing buildings and loans If you'll remember, there is a third requirement in addition to deposits and loans in Section 581. It's that the institution be regulated by the same authorities that regulate other banks. And the buildings and loans, as I understand the legislative history, the reason for that amendment was the building and loan associations did not meet that requirement. So that really doesn't have any bearing on what we're talking about here. It's uncontroverted here that the same state regulators that regulate banks regulate MoneyGram, and we have an appendix to our brief that lists all of those. Thank you. I appreciate the extra time. We don't charge interest.